**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Case No. 6:06CR00386** |
| **Plaintiff,** | : | |
| | : | **JUDGE KATHLEEN O'MALLEY** |
| | : | |
| **v.** | : | |
| | : | **OPINION AND ORDER** |
| **TONY E. DAVIS.** | : | |
| | : | |
| **Defendant.** | : | |

Before the Court is Defendant Tony E. Davis's *Motion to Suppress Evidence* (Doc. 10) in which he seeks to suppress physical evidence and statements made during a traffic stop and his subsequent arrest. The government filed a Response on October 30, 2006 (Doc. 12). The Court held a hearing on the Motion to Suppress on November 30, 2006. At the conclusion of the hearing, the Court invited the parties to submit supplemental briefs. The government's supplemental brief was filed on December 13, 2006 (Doc. 16). Defendant's supplemental authority was filed on December 15, 2006 (Doc. 17). The final transcript of the suppression hearing was filed on January 12, 2007. The matter is now ripe for the Court's consideration.

I.      **BACKGROUND**.

On June 27, 2006, Officer Jonathan Martin of the Boardman Police Department, patrolling within his jurisdiction in a single-man police cruiser, stopped a grey sport-utility vehicle ("SUV") driven by Michael B. Cain. The Defendant, Tony E. Davis, and Cain's young son were passengers in the SUV. According to Officer Martin's testimony, while there were several cars between his cruiser and Cain's vehicle, he observed Cain's driver-side tires move to the left of the yellow line marking a

designated turning lane[1] on three occasions over a quarter mile.  Officer Martin entered the temporary tag number of Cain's vehicle into the computer in his cruiser.  Officer Martin testified that, almost instantaneously, a criminal gang warning flashed on his screen for Cain, the registered owner (and driver) of the vehicle.  Officer Martin then turned on his lights and stopped the SUV at 4:27 p.m.[2] Sometime between 4:27 p.m. and 4:31 p.m., Officer Martin approached the vehicle to request identification from the occupants.  Officer Martin testified that Cain and Davis appeared nervous during the encounter.  According to Officer Martin (and his log sheet), at 4:31p.m. he called the number from the state-issued identification of Defendant Davis in to his dispatch to check for warrants and prior convictions.  Officer Martin learned that Davis had a prior, drug-related conviction.  At 4:32p.m., Officer Martin requested a canine unit, trained to detect illegal drugs, from a neighboring police department.  At 4:33p.m. Officer Richard Romeo, also of the Boardman Police Department, arrived on the scene.[3]  At 4:37p.m., ten minutes after the stop was initiated, Officer Martin contacted his dispatch to request the incident number and time of stop so he could fill them in on a written warning.   Martin said that, as of this point in time, he had decided to issue a warning, rather than a citation, to Cain and had written the warning.[4]   Martin testified, however, that he did not actually hand the completed

---

[1] The road has two northbound lanes, two southbound lanes, and a fifth designated turning lane in the center.

[2] The precise timing throughout is supported by the officers' testimony and Officer Martin's call log, offered as Defendant's exhibit B at the suppression hearing.

[3] Officer Romeo's rapid arrival on the scene is explained by the initial LEADS warning. Romeo was drawn to the scene when Officer Martin entered Cain's tag number which alerts other officers, via their cruiser's computers, that a fellow officer has encountered an individual with a LEADS warning.

[4] As discussed below, it is at this time that the Court finds that the initial purpose of the traffic stop was concluded.

2

warning to Cain until after Davis, his passenger, was arrested.

Officer Daniel Lewis, a trained canine handler for the Beaver Police Department, testified that he arrived at the traffic stop, with his dog Kaz, at 4:43p.m., sixteen minutes after the stop was initiated.[5] Officer Lewis testified that he had a brief exchange with Officer Martin, in which Martin provided information about the vehicle's occupants, and Lewis requested that Martin leave Cain and Davis in the vehicle during the search.  Officer Lewis then took Kaz out of his cruiser and began the dog sniff of Cain's vehicle.

Officer Lewis testified that he first conducted a "free search" in which Kaz is undirected and rapidly moves once around the vehicle, sniffing freely for contraband.  Kaz did not show any indications for contraband during the course of the free search.  Officer Lewis then guided Kaz through a "detailed search" once around the vehicle.[6]  During a detailed search, Officer Lewis presents the vehicle seams, wheel wells, and other areas to Kaz.  Upon reaching the passenger-side door, Kaz became alert, sniffed more intently, and then indicated the presence of contraband by sitting.  At this time, Officer Lewis informed Officer Martin that the canine unit had given an indication for drug odor.

Officer Martin then asked Cain and Davis to exit the vehicle and escorted them to the rear of Officer Romeo's cruiser where Officer Romeo supervised them.  Officer Martin testified that Cain and Davis were not handcuffed at this time, and were not under arrest.  Once the occupants were out of the vehicle, Officers Martin and Lewis conducted a search.  Almost immediately, Officer Martin informed Officer Lewis that his search revealed a handgun in the vehicle's glove compartment.  Officer Martin

---

[5] At some point prior to the dog search Detective Lieutenant Frost, also of the Beaver Police Department, arrived on the scene to observe officer Lewis and Kaz conduct the dog sniff.

[6] The government's witnesses testified that Kaz circled the car twice during the course of the sniff.  Defendant and Cain testified that Kaz circled the car approximately five times.

3

also testified that he discovered little flakes of "non-evidentiary marijuana debris" in the carpet of the vehicle.  (Suppression Hr'g Tr. 19:4-19:12).  Officer Martin said that there was not enough of the vegetable matter to test, and that he may have needed tweezers to retrieve it, but believes it had a slight odor of marijuana.  Neither one of the occupants of the vehicle was charged with possessing marijuana and the evidence was not preserved.  The canine unit's indication and the subsequent search of the car did not reveal any illegal drugs of evidentiary significance.[7]

After discovering the handgun, Officers Martin and Lewis, for their safety, conducted a pat-down of Cain and Davis.  No additional weapons or contraband were found.  Next, Davis was placed in the backseat of Officer Romeo's cruiser and Cain was placed in the rear of Officer Martin's cruiser.  Officer Martin testified that he gave Cain his Miranda warnings, which Cain said he understood.  Officer Martin then asked Cain questions about the handgun and its ownership.  Officer Martin testified that Cain denied ownership of the gun.

Meanwhile, Officer Romeo questioned the Defendant in his cruiser.  Officer Romeo testified that, while Cain and Davis were not free to go at this time, they were not under arrest.  He also testified that he did not provide the Defendant with a Miranda warning prior to the questioning.  Initially, Officer Romeo received no response to his questions about the ownership of the gun from the Defendant.  Officer Romeo testified that he asked the Defendant about the gun three times and conferred with

---

[7] Officers Martin and Lewis also testified that they discovered a cut straw and an unidentified blue pill wrapped in a napkin.  Neither of these items was either tested for the presence of illegal drugs or preserved, nor were any of the occupants charged with their possession.

4

Officer Martin about Cain's questioning at least once, perhaps twice, between those discussions.[8] Eventually, according to Officer Romeo, Davis admitted that the handgun was his.[9]

Once Davis admitted that the handgun was his, Officer Romeo told him he was under arrest and handcuffed him. The Defendant was then placed in Officer Martin's cruiser. According to Officer Martin, Davis was arrested at 5:08 p.m. Officer Martin testified that he gave the Defendant his Miranda warnings, from a preprinted form, at that time. Officer Martin explained that Davis did not sign the form because he was in handcuffs. At 5:09 p.m. Officer Martin proceeded to the police station with Davis. During the short drive to the police station, Martin said that Davis claimed he admitted to possessing the gun because he did not want Cain to get in trouble in front of his son. The Defendant denies ever having his rights read to him and denies having any conversation with Officer Martin during the drive to the police station.

## II.    DISCUSSION.

The Defendant has challenged virtually every aspect of his encounter with the police, including: (1) whether there was probable cause to initiate a traffic stop; (2) whether he was subject to an unlawful seizure during the traffic stop; (3) whether the canine unit's indication that narcotics were in the vehicle, standing alone, provided probable cause to conduct a search; and (4) whether he was adequately advised of his rights prior to interrogation by the police.  These arguments require consideration of the

---

[8] The Defendant testified that Officer Martin and Officer Romeo went back and forth between the cruisers three or four times.  Twenty-five minutes elapsed between when Officer Lewis arrived on the scene to conduct his dog search, and the time Officer Martin stated that he arrested the Defendant.

[9] Officer Romeo testified that the Defendant said: "fuck it, put the gun on me, or it's my gun;" or "well, fuck it, it's mine then."  (Tr. 105:3-105:7;112:15-19).  The Defendant testified that he said "you can quit the good cop-bad cop shit . . . and if you going to place the gun on me, place the gun on me.  If not, let me go."  (Tr. 139:18-25).

Defendant's right to be secure from unlawful search and seizure and/or his right to be free from self-incrimination.

### A.    Probable Cause to Initiate a Traffic Stop.

With regard to the Defendant's challenge of the legality of the initial traffic stop, the Sixth Circuit has held that: "so long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment." United States v. Ferguson, 8 F.3d 385, 391 (6th Cir. 1993).  If probable cause existed, a stop does not violate the Fourth Amendment even if it is based on other motivations.  Id.  The Court, therefore, must determine only whether Officer Martin had probable cause to initiate the traffic stop of Cain's vehicle.  Officer Martin, who has been a police officer for ten years, testified that he personally observed Cain commit three lane violations by crossing over the yellow line separating the designated turning lane from the traveling lanes.  Generally, a police officer's observations are adequate to establish probable cause.  See United States v. Fleenor, No. 05-6444, 2007 WL 30785, at *2 (6th Cir. Jan. 4, 2007).

Davis and Cain both claim that no traffic offense occurred and that the SUV was stopped because the driver was a black male with prior gang involvement.  Indeed, Cain claims that he has been stopped regularly by the Boardman police, despite the exercise of extreme care while driving in that community.  In support of this contention, Davis points out that there were several vehicles between the SUV and Officer Martin's cruiser, likely blocking Officer Martin's view of the vehicle's exact movements; Cain's alleged violation is a highly technical one, not presenting any real safety concerns; and Officer Martin conceded that he was aware of Cain's "gang warning" before he initiated the stop.

6

While Davis's observations are accurate, and Cain's testimony raises concerns about the general practices of the Boardman police, Officer Martin testified that he is certain that he observed Cain commit a traffic violation. He stated, under oath, that he was able to, and did, observe the SUV's tires stray into the turning lane, that he was aware that such a maneuver constituted a traffic violation, and that he made the decision to stop Cain at that point in time (*i.e*, prior to notice of Cain's gang affiliation). The Court finds Officer Martin's testimony on these points credible.[10] Thus, while the circumstances indicate that Officer Martin may also have had an ulterior motive for stopping Cain's SUV, the Court finds that he had probable cause to do so. See Whren v. United States, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.")

### B.      Seizure of the Vehicle and Its Occupants.

Having found that Officer Martin had probable cause to initiate the traffic stop, the Court must determine whether there was a seizure of Cain's vehicle and its occupants. The Fourth Amendment protects interests that include the "freedom of movement and insulation from the fear and anxiety produced by unlawful seizure. In the traffic stop scenario, *these interests are personal to all occupants of the vehicle that is detained . . . .*" United States v. Richardson, 385 F.3d 625, 629 (6th Cir. 2004) (emphasis added) (citing United States v. Mesa, 62 F.3d 159 (6th Cir. 1995)). For a seizure to have occurred, the detention must have lasted beyond the duration necessary to complete the purpose of the initial stop, and the vehicle's occupants must have had a reasonable belief that they were not free to

---

[10] All of the officers actually were very candid in their testimony, not seeming to structure their responses in a way designed to defeat Davis's motion. Indeed, as noted below, it is largely the testimony of the officers themselves that convinces the Court that Davis's motion is, in part, well-taken.

leave.  United States v. Hill, 195 F.3d 258, 264 (6th Cir. 1999) ("Once the purpose of the traffic stop

is completed, a motorist cannot be further detained unless something that occurred during the stop

caused the officer to have a reasonable and articulable suspicion that criminal activity was afoot.")

(citations omitted), *cert. denied*, 528 U.S. 1176 (2000); see also Richardson, 385 F.3d at 629 ("One's

liberty is restrained when a reasonable person would not feel free to walk away and ignore the officer's

requests.") (citations omitted).

> **1.    The Duration of the Detention Exceeded the Time Necessary to Complete the Purpose of the Traffic Stop.**

The traffic violation that served as the basis for Officer Martin's stop was a simple lane

violation.  Officer Martin testified that he only issued a warning for the offense.[11]  Officer Martin's

testimony and log sheet reveal that he called his dispatch for the information needed to complete the

written warning prior to the canine unit's arrival.  Officer Martin also stated that he was writing the

warning before the canine unit arrived.  The Defendant, moreover, testified that Officer Martin told

Cain that "[e]verything panned out, you're cool, you're the owner of the car, you've got proof of

insurance, driver's license, *et cetera*.  But I called the canine unit, and if the canine unit doesn't indicate

or show indication, we'll let you go with a warning."  (Tr. 137:20-138:4).  Cain similarly testified that:

"[Officer Martin] came up to me and said, Mr. Cain, everything is okay we going to walk – going to

walk the dog around you car once.  If he don't give no indication we need to search, we'll let you go."

(Tr. 122:20-122:23).  This testimony was uncontradicted by any government witness.  Indeed, rather

than rebut the testimony relating to Officer Martin's exchange with Cain, the government focused on

---

[11] Officer Martin actually did not present the written warning to Cain until after the Defendant was arrested.  No reason for the delay (other than the canine sniff, the search of the vehicle, and the questioning of Cain and Davis) is apparent.

whether Cain and the Defendant felt they were free to leave *if the dog did not find anything*.  (See Tr. 142:11-143:10).

The Court finds Davis's and Cain's testimony to be credible as it relates to the timing of the events.  This testimony is not contradicted by Officer Martin (whom the Court also finds credible) or his log sheet.  Considering the evidence in its entirety, the Court concludes that Officer Martin had decided to issue, and could have issued, a written warning prior to the canine sniff.  Cain's ownership, license, and insurance did, in fact, "check out" and he was released with the written warning after the Defendant's arrest.  No circumstances justified extending the duration of a simple warning stop to include an additional traffic or safety-related investigation.  Therefore, the only justification to extend the detention – and the justification the government primarily relies upon – would be a reasonable suspicion that criminal activity was afoot, a question the Court addresses below.  See *infra* section II(C).

The government, in the alternative, argues that the canine sniff was legal based on the Supreme Court's holding in Illinois v. Caballes, 543 U.S. 405 (2005).  The government argues that Caballes stands for the proposition that, because a canine sniff is "*sui generis*" and "generally does not implicate legitimate privacy interests" the canine sniff at issue did not violate the Defendant's Fourth Amendment rights.  Caballes, 543 U.S. at 409.  Caballes, however, is readily distinguishable.  The precise holding in Caballes is that:  "the use of a well-trained narcotics-detection dog – one that does not expose noncontraband items that otherwise would remain hidden from public view – *during a lawful traffic stop*, generally does not implicate legitimate privacy interests.  Id. (emphasis added) (noting: "[i]n this case, the dog sniff was performed on the exterior of respondent's car *while he was lawfully seized for a traffic violation*."); see also United States v. Burris, 78 Fed. Appx. 525 (6th Cir. 2003) (affirming undersigned's prior decision holding that a canine sniff without reasonable suspicion, prior to the

conclusion of a traffic stop, did not violate a defendant's rights).

The Supreme Court, however, specifically distinguished the fact pattern here from that at issue in Caballes, stating:

> A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission.  In an earlier case involving a dog sniff that occurred during an unreasonably prolonged traffic stop, the Illinois Supreme Court held that use of the dog and the subsequent discovery of contraband were the product of an unconstitutional seizure.  We may assume a similar result would be warranted in this case if the dog sniff had been conducted while respondent was being unlawfully detained.

Caballes, 543 U.S. at 407-08 (citing People v. Cox, 782 N.E.2d 275 (Ill. 2002)). In Cox, the Illinois Supreme Court found that a fifteen minute delay prior to conducting a canine sniff constituted an unlawful extension of a "routine" traffic stop.[12]  Cox, 782 N.E.2d at 277; see also United States v. Garrett, 139 Fed. Appx. 720, 723 (7th Cir. 2005) (stating: "it does not matter how quickly a dog arrives after being called because a suspect might already be illegally detained by the time of the call.").  This Court, after considering the sequence of events, the candid testimony of Officer Martin, and the uncontradicted testimony of the Defendant and Cain, finds that the duration of the detention exceeded the time necessary to

---

[12] The Court recognizes the similarity between the sixteen minute delay prior to the canine sniff at issue in this case, and the fifteen minute delay in Cox.  The Court, however, does not, and need not, set an arbitrary duration for a traffic stop.  Officer Martin's statement and log show that he had written the warning *before* the canine unit arrived.  This, coupled with the Defendant's and Cain's unrebutted testimony, compels the conclusion that the traffic stop was complete prior to the detention for the drug sniff.  The critical inquiry here does not turn on minutes, but on purpose.  Indeed, under different circumstances the Sixth Circuit has found traffic stops well in excess of the time period here to be legal.  See, e.g., United States v. Garrido, 467 F.3d 971 (6th Cir. 2006) (finding that a roadside safety inspection of a commercial truck lasting over an hour was justified based on a reasonable belief that a safety violation is occurring).

complete the purpose of the initial traffic stop.  Thus, like Cox, unless the vehicle's occupants felt free to leave, or there was a basis for a reasonable suspicion that Cain and Davis were involved in criminal activity, an unconstitutional seizure occurred.

> **2.  The Occupants of the Vehicle Reasonably Believed that They Were Not Free to Leave Until After the Dog Sniff.**

As discussed above, the traffic stop should have concluded when Officer Martin informed Cain that his information "checked out."  The Court, therefore, must analyze whether Cain and Davis felt free to go in light of Officer Martin's statements.  It is not necessary for Officer Martin to use physical force or expressly order the occupants not to leave for the situation to rise to the level of a seizure.  The Sixth Circuit has recognized that the words of an officer alone can be enough to make a reasonable person feel that he was not free to leave. Richardson, 385 F.3d at 629-30 (citations omitted).  Further, even if Officer Martin's words were directed at Cain, Davis was still subject to the seizure.  See id. ("When a driver is not free to leave, neither are his passengers; indeed, the passengers are at the mercy of any police officer who is withholding the return of their driver.") (citations omitted).

Officer Martin told Cain that he would be free to go *if* a canine search did not reveal the presence of illegal drugs.  The implication there is clear:  Cain was to stay put until, at least, the canine search was completed.  Accordingly, the Court finds that an ordinary person would not feel free to leave until *after* the detention lasted long enough for the canine unit to arrive and complete its sniff of the vehicle (and perhaps not even then).  A seizure, therefore, occurred.

> **C.  Reasonable Suspicion Justifying the Continued Detention of the Vehicle's Occupants Did Not Exist.**

There are three types of permissible encounters between police and citizens: (1)

consensual encounters in which contact is initiated by a police officer without any articulable reason and the citizen is briefly asked some questions; (2) a temporary involuntary detention or *Terry* stop which must be predicated upon "reasonable suspicion;" and (3) arrests which must be based on probable cause. United States v. Alston, 375 F.3d 408, 411 (6th Cir.2004) (internal quotations and citations omitted). A typical traffic stop is analogous to a Terry stop. Berkemer v. McCarty, 468 U.S. 420, 439 (1984) (citing Terry v. Ohio, 392 U.S. 1 (1968)). "Once the purpose of the traffic stop is completed, a motorist cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable and articulable suspicion that criminal activity was afoot." Hill, 195 F.3d at 264 (citations omitted).

Having concluded that the purpose of the traffic stop was completed, the Court turns to whether Officer Martin had reasonable suspicion to detain the vehicle and its occupants for the canine sniff. Reasonable suspicion requires "more than an ill-defined hunch." Richardson, 385 F.3d at 630. It must be based on "a particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 417-18 (1981). A court must consider the totality of the circumstances when determining whether an officer had reasonable suspicion of criminal activity. Id.; United States v. Knox, 839 F.2d 285, 289 (6th Cir. 1988), *cert. denied*, 490 U.S. 1019 (1989). The evidence offered in support of reasonable suspicion is viewed using a common sense approach. Richardson, 385 F.3d at 630 (citations omitted).

Officer Martin testified that the occupants' nervousness and prior criminal involvement served as the bases for the prolonged detention. Officer Martin also testified that he did not fear for his safety and did not detect any marijuana odor. Officer Martin's explanation of the

occupants' nervousness was non-specific, stating only that they were terse and somewhat rigid. He could not, when asked, describe any movements or specific answers that demonstrated nervousness or evasiveness.

Nervousness has been deemed an "unreliable indicator, especially in the context of a traffic stop." Richardson, 385 F.3d at 629 (agreeing with the district court's finding that severe nervousness, including trembling, conflicting travel explanations, and a passenger's movement into the driver's seat did not provide reasonable suspicion to justify detention beyond the purpose of a traffic stop); see also United States v. Smith, 263 F.3d 571, 594 (6th Cir. 2001) (affirming district court's determination that reasonable suspicion did not exist, giving little weight to "nervousness" of defendant); United States v. Chavez-Valenzuela, 268 F.3d 719, 726 (9th Cir. 2001) ("We therefore hold that nervousness during a traffic stop . . . in the absence of other particularized, objective factors, does not support a reasonable suspicion of criminal activity and does not justify an officer's continued detention of a suspect after he has satisfied the purpose of the stop."); United States v. Beck, 140 F.3d 1129, 1139 (8th Cir. 1998) (reversing denial of motion to suppress, "conclud[ing] that any suspicion associated with [defendant's] nervous demeanor during the traffic stop to be, at best, minimal."); United States v. Wood, 106 F.3d 942, 948 (10th Cir. 1997) ("We have repeatedly held that nervousness is of limited significance in determining reasonable suspicion . . . .") (citations omitted).  Given the absence of any specific characterizations of extreme nervousness, the Court assigns little, if any, value to that factor.

The remaining factor cited by Officer Martin for continuing the detention to investigate potential criminal activity was the criminal records of the vehicle's occupants.  A prior criminal

13

record, while it may play a part in the totality of the circumstances to be considered, generally is not given substantial weight.  United States v. Laughrin, 438 F.3d 1245, 1247 (10th Cir. 2006) ("To find reasonable suspicion in this case could violate a basic precept that law-enforcement officers not disturb a free person's liberty solely because of a criminal record.  Under the Fourth Amendment our society does not allow police officers to 'round up the usual suspects.'"); Wood, 106 F.3d at 948 ("[W]e are left with Mr. Wood's nervousness and his prior narcotics history – both factors which this court has cautioned are of only limited significance in determining whether reasonable suspicion existed.").  The fact of prior gang affiliation, moreover, does not significantly address any "individualized" suspicion, but targets a broad class of people.  United States v. Mendez, 467 F.3d 1162, 1169 (9th Cir. 2006) ("Reasonable suspicion may not be based on broad profiles which cast suspicion on entire categories of people without any individualized suspicion of the particular person to be stopped.").  Under the circumstances, therefore, the Court finds that the unparticularized factors cited by Officer Martin did not provide reasonable suspicion to detain either the Defendant or Cain.  To find otherwise in this case would all but abolish the requirement of a particularized and objective basis for suspicion and establish a separate standard authorizing the detention of all persons previously convicted of crimes, regardless of the circumstances.  The Court declines to establish such a standard.

> **D.** **Suppression of the Evidence Discovered As a Result of the Illegal Detention of Defendant and Mr. Cain.**

Having concluded that the extended detention of the Defendant was unconstitutional, the Court must address whether the handgun recovered by Officer Martin and the statements made by the Defendant should be suppressed.

14

**1.**     **The Fourth Amendment Does Not Provide a Basis For the Defendant to Suppress the Handgun Discovered By Officer Martin.**

Courts routinely deny a passenger's challenge to evidence obtained during the illegal search of an automobile in which the passenger has no expectation of privacy.  Rakas v. Illinois, 439 U.S. 128, 134 (1978) ("A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed.").  Davis has not argued that he has any possessory interest in Cain's vehicle.  Thus, Davis had no reasonable expectation of privacy in the contents of Cain's glove compartment at the time of the search and cannot therefore challenge the constitutionality of the search or seizure of the gun found therein.  "Fourth Amendment rights are personal rights, which, like some other constitutional rights, may not be vicariously asserted."  United States v. Carter, 14 F.3d 1150, 1154 (6th Cir. 1994) (quoting Rakas, 439 U.S. at 133-34.  The handgun seized by the Boardman Police Department cannot be suppressed at Davis's request, despite the unlawful *search* of Cain's vehicle.[13]

The Defendant, however, does have the ability to challenge the legality of his own *detention*.  Recently federal courts have examined the finer distinction at issue here:  whether a passenger's *illegal detention* subsequent to a traffic stop provides a basis for suppressing evidence discovered during the stop.  See Carter, 14 F.3d 1150; see also United States v. Wagner, 193 Fed. Appx. 463, 465 (6th Cir. 2006)  United States v. Mosely, 454 F.3d 249 (3d Cir. 2006); United States v. Pulliam, 405 F.3d 782 (9th Cir. 2005); United States v. Guevara-

---

[13] The government did not assert this ground in opposition to Davis's motion to suppress. The Court finds, however, that a defendant's standing to seek an order of suppression is a threshold issue the Court must always assess, and that a defendant's lack of standing is not waived by the government's failure to raise it.

15

Martinez, 262 F.3d 751 (8th Cir. 2001).  The determinative issue is the causal relationship between the traffic stop and the discovery of the evidence.  Carter, 14 F.3d at 1155; Mosely, 454 F.3d at 253.  This issue turns, in large part, on whether the initial traffic stop was legal.  See Mosely, 454 F.3d at 265, 266.  In Mosely, the Third Circuit recognized the distinction, noting: "the prevailing rule in the courts of appeals is that an *illegal traffic stop* entails a suppression remedy for all occupants of the car," but, discussing Carter, "[a]s long as the police initially obtained control over the vehicle legally, then (on the Deluca reasoning) no search of the vehicle *after* that point, no matter how unconstitutional, will be subject to challenge by a passenger."  Id. (collecting cases) (parentheticals in original, first emphasis added) (citing Carter, 14 F.3d at 1154-55; United States v. Deluca, 269 F.3d 1128 (10th Cir. 2001)).

The rationale among the circuit courts of appeal appears to be that, if the car was illegally stopped initially, then a passenger generally may assert a Fourth Amendment challenge because, but for that initial illegal detention (of which he was a part), no evidence would have been discovered.  If, however, the initial stop was legal but *evolved* into an unlawful detention, then the required factual nexus does not necessarily exist, because the evidence discovered in the car would have been discovered even without the passenger's personal detention (by virtue of the unlawful detention of the driver – whose right to be free from that detention the passenger cannot assert).  In sum, "[i]n order to . . . demonstrate the required factual nexus, [a Defendant] must show that the [evidence] would never have been found but for *his*, and only his, unlawful detention."  Deluca, 269 F.3d at 1133 (emphasis in original).

The Sixth Circuit recently addressed a passenger's request to suppress evidence obtained during the course of an illegal detention and search of another's vehicle.  Carter, 14 F.3d 1150.

In <u>Carter</u>, police officers pulled over a van in which the defendant, Carter, was a passenger. After conducting a search of the van, the officers discovered several hundred pounds of marijuana.  A jury found Carter guilty on possession and aiding-and-abetting charges relating to the marijuana.  Carter appealed the denial of his motion to suppress.  The Sixth Circuit assumed, for purposes of its analysis, "not only that the . . . arrest of the driver was unconstitutional, but also that the detention of Mr. Carter, if not illegal from the outset, became illegal when the driver was arrested."  <u>Id.</u> at 1154.[14]  The Sixth Circuit stated: "[i]t does not follow from any of this, however, that the discovery and seizure of the marijuana represented the 'fruit' of Mr. Carter's unlawful detention," observing that the drugs would have been found even if Carter had not been detained, by virtue of the driver's detention.  <u>Id.</u>  The Court found that Carter's detention was not the proximate cause of the search of the van, and noted that "Fourth Amendment rights are personal rights, which, like some other constitutional rights, may not be vicariously asserted."  <u>Id.</u> (quoting <u>Rakas</u>, 439 U.S. at 133-34).  Therefore, because Carter's detention was not the proximate cause of the search, and Carter could not assert the driver's Fourth Amendment right to be free from illegal detention, he could not challenge the admission of the evidence.[15]  <u>Compare</u> <u>Carter</u>, 14 F.3d 1150 (affirming denial of suppression

---

[14] Thus, though the Court affirmed the denial of the passenger's motion to suppress, it did not specifically consider whether the legality of the initial stop alone was determinative of the factual nexus.  <u>Carter</u>, 14 F.3d at 1154 ("And whether or not the original traffic stop was unconstitutional – an issue that was not preserved in Carter's objection to the magistrate's report and that we do not reach here – we shall assume . . . that the detention of Mr. Carter . . . became illegal . . . .").

[15] The Sixth Circuit recently reiterated that holding from <u>Carter</u>.  <u>See</u> <u>Wagner</u>, 193 Fed. Appx. at 465 ("In <u>Carter</u>, we held that a passenger had no standing to move for the suppression of drugs found in the car in which he had been traveling, because their discovery was the fruit not of his illegal detention, but of the driver's.")

17

of evidence discovered during a defendant-passenger's unlawful detention, subsequent to a

traffic stop (whether legal or illegal), because the evidence *in a car* would have been discovered

by virtue of a third party's detention) <u>with</u> <u>Richardson</u>, 385 F.3d 625 (affirming suppression of

evidence discovered during a defendant-passenger's unlawful detention, subsequent to a legal

traffic stop, because the evidence discovered during *a frisk of the defendant* could not have been

discovered absent the unlawful detention of the defendant).

The facts here are akin to those in <u>Carter</u>. In <u>Carter</u>, discussing the causal nexus between

the detention of the defendant and the search, the Court reasoned:

> Suppose that at the time of the driver's arrest the police had summoned a taxi
> cab for [the defendant] and told him he was free to leave. The [evidence] would
> still have been discovered, because it was located in a van owned and controlled
> by [the driver] (who was not going anywhere until his vehicle had been
> searched) and not in a vehicle controlled by [the defendant].

<u>Carter</u>, 14 F.3d at 1154 (alterations added, parenthetical in original). Here, similarly, the

handgun in the glove compartment would have been discovered by virtue of the detention of

Cain, even if the Defendant was not detained. The Court, based on the rationale applied by the

Sixth Circuit in <u>Carter</u>, finds Defendant's argument seeking to suppress the handgun is not well

taken, despite the otherwise illegal duration of the stop.

### 2. The Defendant's Statements Are the Result of *His* Unlawful Detention.

The analysis of the Defendant's alleged statements is decidedly different. The

challenged statements are also the result of an unlawful detention, but they only were available

from the Defendant. Applying the principle summarized above by the Tenth Circuit, where:

"[Defendant] must show that the [evidence] would never have been found but for *his*, and only

his, unlawful detention" yields a different result. <u>Deluca</u>, 269 F.3d at 1133 (emphasis in

18

original).  Here, unlike the handgun, but for the Defendant's, *and only the Defendant's*, detention, the statements would not exist.  As noted above, the Sixth Circuit has recognized a distinction between asserting one's "own legal rights and interests [and] basing [a] claim for relief upon the rights of the driver or another third party."  Carter, 14 F.3d at 1154 (distinguishing between evidence yielded as a result of the search of a passenger's person, and evidence yielded as a result of the search of a car a passenger was traveling in) (citing United States v. Durant, 730 F.2d 1180 (8th Cir. 1984)); see also Richardson, 385 F.3d 625 (affirming suppression of evidence discovered during a frisk of the defendant-passenger).  The Court, therefore, finds Defendant's alleged statements to the police must be suppressed.[16]

## III.    CONCLUSION.

For the reasons discussed above, Defendant's *Motion to Suppress Evidence* (Doc. 10) is **GRANTED in part** and **DENIED in part**.  The Defendant's alleged statements will be suppressed; the handgun discovered in Cain's glove compartment will not be suppressed.

IT IS SO ORDERED.

s/Kathleen M. O'Malley
KATHLEEN McDONALD O'MALLEY
Dated: February 8, 2007                    UNITED STATES DISTRICT JUDGE

---

[16] While the Court need not reach the issue, the statements to Officer Romeo, made in a custodial setting without Miranda warnings, likely would be subject to a suppression order in any event.

19